# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Dale Brunelle,

                Plaintiff,        Case No. 16-cv-13446

v.                                       Judith E. Levy
                                            United States District Judge

Mid-America Associates, Inc., and
Liberty Union Life Assurance      Mag. Judge Elizabeth A. Stafford
Company,

                Defendants.

_____/

# OPINION AND ORDER GRANTING IN PART AND DENYING IN PART WITHOUT PREJUDICE PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD [19] AND DENYING WITHOUT PREJUDICE DEFENDANTS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD [21]

This case involves plaintiff Dale Brunelle's claim for benefits allegedly owed to him by defendants, pursuant to the terms of his ERISA benefit plan. Plaintiff and defendants have filed motions for judgment on the administrative record. (Dkts. 19, 21.)

For the reasons set forth below, plaintiff's motion is granted in part and denied in part without prejudice, and defendants' motion is denied without prejudice.

## I. Background

Plaintiff Dale Brunelle is an employee of Smith Construction Company, and is enrolled in an employee welfare benefit plan governed by ERISA, 29 U.S.C. § 1002 *et seq.* The plan went into effect on June 1, 2014. (Dkt. 15 at 372.) Defendants are insurance companies that "serve as the benefit administrators and ERISA 'fiduciaries' of the medical portion of [the] Smith Construction employee welfare benefit plan." (Dkt. 19 at 11; Dkt. 15 at 373 ("The Administrator for the Plan is Mid-America Associates and Liberty Union Life Assurance Company").)

The events giving rise to plaintiff's claim began on or about May 27, 2014, when plaintiff began bleeding uncontrollably from his nose. He went to the emergency room at Marquette General Hospital on May 31, 2014, where doctors cauterized his nose to stop the bleeding. The treatment was unsuccessful, so plaintiff returned to the emergency room the following day.

Brunelle was then referred to Superior ENT for treatment. On June 3, 2014, he was treated at Superior ENT, but the bleeding did not cease. He returned on June 4, and the doctors attempted a different treatment with an inflatable balloon, instructing him to return in three

2

days. However, the new treatment caused plaintiff to begin bleeding from his eye sockets, so he sought treatment again on June 5, at which point the physician recommended surgery.

Plaintiff underwent surgery on June 6, 2014. The bleeding continued despite the procedure, and on June 11, 2014, plaintiff was admitted to Marquette General Hospital.

Plaintiff's treating physician, Dr. Manish Kesliker, consulted with a hematologist on staff, and determined that plaintiff should be transferred to another hospital for diagnosis and treatment. (Dkt. 15 at 62.) Dr. Kesliker's records from June 12, 2014 show that the hematology department concluded that plaintiff "could not be treated at [Marquette General] as most of the labs . . . would need to be send-out [*sic*] labs and it would take several days to get the results," which would cause plaintiff to "be here unneededly." (*Id.* at 62–63.) Thus, hematology recommended plaintiff be transferred, and Dr. Kesliker then contacted the University of Michigan, which agreed to accept him as a patient. (*Id.* at 63.) Plaintiff's treating physician also recommended that he be transferred by air ambulance, instead of ground ambulance.

According to one transfer form, the benefits of the transfer were "availability of specialized services, facilities, diagnostic equipment, [and] personnel." (Dkt. 15 at 67.) Further, the prehospital care report states that plaintiff needed to be transported "for clotting factor surgery not available at Marquette General." (Dkt. 15-1 at 73.) A December 23, 2014 letter from Dr. Kesliker also states that the University of Michigan was recommended because Marquette General "did not have the capabilities to get the bleeding to stop," and the University of Michigan was "the closest facility to handle this coagulation problem." (Dkt. 15 at 56.)

Records from June 12, 2014 also indicate that Dr. Kesliker believed air transport should be used to avoid the risks of "traffic and inclement weather." (*Id.*) The December 23, 2014 letter further explains that air ambulance was used because plaintiff "has a rising INR, hemoglobin had dropped nearly 2 grams in 18 hours after receiving multiple units of fresh frozen plasma, and an ambulance ride would take in excess of greater than 8 hours," which "increased his risk uneedingly [*sic*]." (Dkt. 15 at 56.) More specifically, plaintiff's symptoms indicated that the "risk of

4

spontaneous bleeding was great," and he "was at increased risk for severe anemia, acute MI, flash pulmonary edema, and even death." (*Id.*)

After plaintiff was transferred to the University of Michigan hospital, he was diagnosed with a rare blood disorder, and successfully treated. On or about November 3, 2014, he filed a claim for medical benefits. On November 21, 2014, defendants agreed to pay the claim, except the $57,950 bill for the air ambulance. (Dkt. 15-1 at 53–54.)

In defendants' first notice of adverse benefits determination, dated July 20, 2015, the claim for the air ambulance was denied as not medically necessary. Defendants cited the findings of an independent physician reviewer to support the determination. (Dkt. 15-1 at 53–57.) The reviewer, obtained through the Medical Review Institute of America, Inc., was asked if there was "a specific lab test . . . that could only be provided by the University of Michigan hospital," and if the "medical records submitted meet plan definition of medical necessity for the air ambulance transfer." (*Id.* at 56; Dkt. 15-1 at 78.) The reviewer answered both questions in the negative, stating that medical necessity had not been established because plaintiff "was hemodynamically stable, and there was no indication that ground transport would have placed the

5

patient's health in jeopardy." Further, (1) "[h]is bleeding was controlled"; (2) "[t]here were no weather considerations that would have been a contraindication for ground transport"; and (3) "Ann Arbor, MI was not the closest appropriate facility to treat his condition." (*Id.* at 78–79.)

On September 25, 2015, defendants issued a second and final adverse benefits determination, again concluding the air ambulance was not medically necessary. (Dkt. 15-1 at 6.) Defendants relied on the independent physician reviewer reports obtained from the Medical Review Institute of America, Inc. (also relied on in the first adverse determination) and Advanced Medical Reviews. (*Id.* at 9.) Both reviewers were asked nearly identical questions, and gave similar responses.

The second reviewer, obtained through Advanced Medical Reviews, concluded that the air ambulance was not medically necessary because "plan language allows for a transfer to the nearest facility," which was not the University of Michigan hospital, and therefore the transfer was not "in accordance with the standards of good medical practice, cost-effective, [or] consistent with the [plaintiff's] diagnosis." (*Id.* at 25.) Further, the second reviewer stated that the air ambulance was likely

6

"primarily for the convenience of the member and/or provider," which was inconsistent with the definition of medical necessity. (*Id.*)

Defendants also stated that they took into consideration the June 12, 2014 discharge summary and certification of transfer prepared by Dr. Kesliker, and the patient choice letter in which plaintiff stated, "I choose to request services from: U/M." (Dkt. 15-1 at 8.) Specifically, defendants concluded that these documents showed the treating physician did not adequately consider facilities other than the University of Michigan, did not support the need for transfer to a Level 1 trauma facility, and did not suggest more than a transfer for convenience. (*Id.*)

After defendants denied the claim for the air ambulance, plaintiff appealed the decision and defendants obtained an external review from an independent review organization, Network Medical Review. (Dkt. 15 at 11–12.) This review also determined the air transport was "not medically necessary as . . . defined in the Plan" because "the nearest facility capable of providing [appropriate care] was not utilized," and plaintiff "was hemodynamically stable and in no immediate danger" at the time of transport. (*Id.* at 13–14.)

7

Following these adverse determinations, plaintiff filed this lawsuit, arguing defendants acted arbitrarily and capriciously, and seeking past due medical benefits totaling $57,950, an accounting, and reasonable attorney fees and costs. (Dkt. 1.)

## II. Legal Standard

Both parties agree that defendants' denial of benefits should be reviewed under the arbitrary and capricious standard. (Dkt. 21 at 7–8; Dkt. 19 at 23.) But plaintiff also claims that he is "arguably entitled to *de novo* review" because defendants "are also insuring portions of the benefits," and Michigan regulations do not permit insurance contracts to include discretionary clauses. (Dkt. 19 at 23.)

First, plaintiff appears to argue he is entitled to de novo review because defendant has a conflict of interest. But where a benefit plan contains a discretionary clause, as is the case here, the "conflict must be weighed as a factor in determining whether there is an abuse of discretion," and itself does not warrant de novo review. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)); *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006).

Next, the Sixth Circuit has held that the Michigan regulations banning discretionary clauses, MICH. ADMIN. CODE R. 500.2201-2202, are not preempted by ERISA, at least insofar as the regulations apply to discretionary clauses in insurance policies. *Amer. Council of Life Ins. v. Ross*, 558 F.3d 600, 606–07 (6th Cir. 2009). These regulations define and prohibit a discretionary clause as "a provision in a form that," among other things, "[p]rovides that the insurer's decision to deny policy coverage is binding upon a policyholder" or "[p]rovides that or gives rise to a standard of review on appeal other than a *de novo* review." MICH. ADMIN. CODE R. 500.2201(c).

"Form" is defined and limited to those documents identified in MICH. COMP. LAWS § 500.2236(1). And "form" excludes ERISA plan documents and summary plan descriptions. Thus, the Michigan regulation does not apply to this case because the discretionary clause at issue is contained in the ERISA plan, not a policy document. *Hess v. Metro. Life Ins. Co.*, 91 F. Supp. 3d 895, 901 (E.D. Mich. 2015); *Rose v. Liberty Life Assurance Co. of Boston*, Case No. 15-cv-28, 2016 WL 1178801, at *2–3 (W.D. Ky. Mar. 22, 2016); *Markey-Shanks v. Metro. Life*

9

*Ins. Co.*, Case No. 12-cv-342, 2013 WL 3818838, at *6 (W.D. Mich. July 23, 2013).[1]

Because plaintiffs' arguments for the application of de novo review are unavailing, the Court now turns to established Supreme Court precedent on the appropriate standard of review in ERISA cases. To determine the appropriate standard of review, a court "should be 'guided by principles of trust law,'" and "[w]here the plan . . . grant[s] 'the administrator or fiduciary *discretionary authority* to determine eligibility for benefits,' *Firestone [Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)], 'trust principles make a *deferential* standard of review appropriate.'" *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (quoting *Firestone*, 489 U.S. at 111) (emphasis in original). Because the ERISA plan in this case contains a discretionary clause, the Court will apply the arbitrary and capricious standard of review. *See Calvert v.*

---

[1] Moreover, as the Sixth Circuit made clear, even though Michigan is permitted "to remove a potential conflict of interest" through its regulation, it is not the case that the regulation "will be allowed to dictate the standard of review for all ERISA benefits claims." *Ross*, 558 F.3d at 609. For example, while courts may apply de novo review in "lawsuits dealing with the meaning of an ERISA plan, it does not follow that they will do so in reviewing the application of a settled term in the plan to a given benefit request." *Id.* In this case, the terms disputed by the parties are defined in the plan, and the parties contest only whether the enforcement of those terms was improper. Thus, even if the regulation were applicable in this case, de novo review would not be appropriate.

*Firstar Fin., Inc.*, 409 F.3d 286, 291–92 (6th Cir. 2005) (applying arbitrary and capricious standard of review).

The arbitrary and capricious standard of review is "the least demanding form of judicial review of administrative action," and a decision must be upheld "if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." *Evans*, 434 F.3d at 876 (internal quotations and citations omitted). But the standard "is not . . . without some teeth," and "[t]he obligation under ERISA to review the administrative record . . . inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Id.*

And, as discussed above, a conflict of interest is a factor considered in determining whether the decision was arbitrary and capricious. *Evans*, 434 F.3d at 876. A "conflict of interest exists when the insurer both decides whether the employee is eligible for benefits and pays those benefits." *Id.* Further, a conflict of interest exists when a professional insurance company is authorized "both to decide whether an employee is eligible for benefits and to pay those benefits." *Glenn*, 554 U.S. at 114–15.

11

## III. Analysis

Plaintiff argues that defendants acted arbitrarily and capriciously in denying the claim for the air ambulance. (Dkt. 19.) Defendants argue that the denial was not arbitrary and capricious, but was based on substantial evidence. (Dkt. 21.)

### *Terms of the ERISA Plan*

Under plaintiff's ERISA plan, "covered expenses" are defined, in relevant part, as "services and supplies" that are "listed as a Covered Expense in the Plan" and "Medically Necessary as defined by the Plan." (Dkt. 15 at 471.)

"Medically Necessary" includes "all care" that, in relevant part, is "required for reasons other than the convenience of the health care provider or the comfort or convenience of the patient," and "provided in a cost-efficient manner and type of setting appropriate for the delivery of that service/supply." (Dkt. 15 at 478.) And "[t]he fact that a doctor performs or prescribes a procedure or treatment . . . does not mean that it is medically necessary as defined." (*Id.*)

Finally, included in "Covered Services" is Ambulance Service, both "local ground or air transportation" provided that transport is "to the

12

nearest hospital or facility that can provide necessary care of an Emergency Medical Condition or within 48 hours of an injury requiring immediate emergency care." (Dkt. 15 at 388.) The transport must also be "medically necessary." (*Id.*) Expressly excluded from coverage is "Non-emergency ambulance transportation including those for the convenience of the patient." (*Id.*)

### *Administrative Determinations*

Plaintiff argues defendants' determinations to deny benefits were arbitrary and capricious, and not supported by substantial evidence. Defendants argue the contrary.

As described above, defendants relied on the reports of the independent medical reviewers in denying plaintiff's claim, plaintiff's medical records, and certification of transfer prepared by the treating physician. But for the reasons set forth below, the independent medical reviews and defendants' determinations failed to address or adequately explain several significant pieces of evidence in the record.

First, the medical records and transfer form prepared by the treating physician include evidence favorable to both plaintiff and defendants. For example, the record shows that plaintiff may have

needed surgery services not available at Marquette General Hospital, not just certain lab tests, and the December 23, 2014 letter indicates that Marquette General Hospital was incapable of diagnosing or treating the disease and that ground transport could pose serious risks to plaintiff's health. Further, plaintiff's treating physician wrote in the December 23, 2014 letter that the University of Michigan hospital was "the closest facility to handle this coagulation problem." (Dkt. 15 at 56.) Nowhere is any of the evidence favorable to plaintiff addressed by the independent medical reviewers or defendants.

The adverse determinations may indicate that defendants found the evidence favorable to plaintiff, such as the December 23, 2014 letter, unreliable. But defendants must give reasons for why they found them unreliable, and failed to do so here. And although a "treating physician does not have to be afforded special deference by an ERISA plan administrator . . . , neither can [the administrator] arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Smith v. Continental Cas. Co.*, 450 F.3d 253, 262 (6th Cir. 2006) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). Thus, defendants' failure to give reasons for why they rejected

14

the favorable evidence constitutes "[a]n example of arbitrary and capricious behavior," in which a plan administrator "gave greater weight to a non-treating physician's opinion [over a treating physician's opinion] for no apparent reason." *Goetz v. Greater Ga. Life Ins. Co.*, 649 F. Supp. 2d 802, 813 (E.D. Tenn. 2009) (quoting *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006)); *see also Helfman v. GE Grp. Life Assurance Co.*, 573 F.3d 383, 394 (6th Cir. 2009).

Defendants' error is further compounded by the fact that the independent medical reviewers were never asked to consider more than whether plaintiff needed specific lab tests available only at the University of Michigan hospital and whether the claim satisfied the definition of "medically necessary." Thus, the reviewers were arbitrarily limited in their review of plaintiff's needs, given that the records indicate plaintiff may have needed surgery services available only at the University of Michigan hospital and that it was the closest facility to treat his coagulation problems.

The reports from the independent medical reviewers are also insufficient. In particular, their responses to the issue of "medically necessary" are only five or six sentences, and "the reasoning . . . is

15

underdeveloped and therefore unclear." *Bailey v. United of Omaha Life Ins. Co.*, 938 F. Supp. 2d 736, 748 (W.D. Tenn. 2013). For example, the reviewer from the Medical Review Institute of America, Inc. did not explain why the University of Michigan hospital "was not the closest appropriate facility." (Dkt. 15-1 at 78.)

Similarly, the Advanced Medical Review report stated that "[t]he plan language allows for a transfer to the nearest facility that can provide care as needed," and concluded the transfer to the University of Michigan hospital was therefore not cost-effective or consistent with the standards of good medical practice. (Dkt. 15-1 at 25.) No additional explanation is given.

Taking all of the above evidence into consideration, defendants failed to adequately consider and explain the conflicting evidence in the record. Accordingly, the adverse determinations are not the result of a deliberate principled reasoning process, and defendants acted arbitrarily and capriciously in denying plaintiff's claim. And given the amount of evidence potentially favorable to plaintiff, defendants' decision is not supported by substantial evidence.

### *Conflict of Interest*

Plaintiff argues defendants have a financial conflict of interest, citing *Glenn*, 554 U.S. 105, arguing (1) that the "Plan is partially-insured and is underwritten for excess loss insurance coverage," and (2) the internal emails allegedly showing defendants were predisposed not to pay the claim. (Dkt. 19 at 24–25.)

First, as defendants points out, excess loss insurance coverage is not relevant to the case at hand. The question is whether defendants arbitrarily and capriciously determined plaintiff's air ambulance did not qualify as a "covered expense" because it was not "medically necessary."

That said, the conflict of interest identified by the Supreme Court in *Glenn* may be present here because defendants make eligibility determinations and pay out claims. *See Glenn*, 554 U.S. at 110, 114–15; *Elliott*, 473 F.3d at 621. For example, the emails cited by plaintiff include some evidence to suggest defendants did not want to pay such a large claim. (*See* Dkt. 15-1 at 400 ("This bill would be outrageous with advanced life support . . . none of which this patient required"); 15-1 at 404 (in response to whether the Plan intended to include air ambulance under the circumstances, "Oh heck no. This air bill $57,950 is almost

17

twice that of the 4 day U/M hospital stay $22,878!").) Further, as discussed in detail above, defendants' conduct in rendering adverse benefit determinations "consisted of selective deference to opinions and medical evidence regarding [plaintiff's] eligibility," which "renders the conflict of interest significant." *Zenadocchio v. BAE Sys. Unfunded Welfare Ben. Plan*, 936 F. Supp. 2d 868, 886 (S.D. Ohio 2013) (citing *Kalish v. Liberty Mut./Liberty Life Assurance Co.*, 419 F.3d 501 (6th Cir. 2005)). And the questions put to the independent reviewers were improperly narrow given the medical evidence indicating that Marquette General Hospital was unable to diagnose or treat plaintiff's condition.

Taken together, this evidence suggests a conflict of interest influenced the administrative process, especially the questions submitted to the independent reviewers, and therefore "raise[s] questions about the thoroughness and accuracy of the benefits determination." *Johnson v. Conn. Gen. Life Ins. Co.*, 324 F. App'x 459, 468 n.8 (6th Cir. 2009). However, the Court need not make a finding on this issue, but if it were pressed to do so, this factor would likely weigh in favor of plaintiff in this case.

## IV. Conclusion

As set forth above, defendants acted arbitrarily and capriciously when determining whether to deny plaintiff's claim for benefits.

Because defendants failed to make sufficient factual findings and it is unclear from the record whether the claim should be granted, it is ORDERED that the case shall be remanded for further consideration. *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 699–700 (6th Cir. 2014) (citing *Williams v. Int'l Paper Co.*, 227 F.3d 706, 715 (6th Cir. 2000)).

Accordingly, plaintiff's motion for judgment on the administrative record (Dkt. 19) is GRANTED IN PART and DENIED IN PART WITHOUT PREJUDICE.

Defendants' motion for judgment on the administrative record (Dkt. 21) is DENIED WITHOUT PREJUDICE.

IT IS SO ORDERED.

Dated: August 21, 2017　　　　　s/Judith E. Levy
Ann Arbor, Michigan　　　　　　JUDITH E. LEVY
　　　　　　　　　　　　　　　United States District Judge

## **CERTIFICATE OF SERVICE**

  The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 21, 2017.

             s/Shawna Burns
             SHAWNA BURNS
             Case Manager